Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
Lauren Chase (Bar No. 324162)
Email: lauren@coastkeeper.org
ORANGE COUNTY COASTKEEPER &
INLAND EMPIRE WATERKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiffs Inland Empire Waterkeeper*
*& Orange County Coastkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

INLAND EMPIRE WATERKEEPER, a
program of Orange County Coastkeeper,
and ORANGE COUNTY
COASTKEEPER, a California non-profit
corporation;

                   Plaintiffs,

    v.

PREZERO US, INC.; PREZERO US
SERVICES, LLC; 170 NORTH TURNER,
LLC; APOLLO SOUTHWEST, INC.; and
ARMEN DERDERIAN;

                   Defendants.

Civil Case No. 8:21-cv-1001

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)**

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively "Waterkeepers" or "Plaintiffs"), by and through counsel, hereby allege:

## I.      JURISDICTION AND VENUE

1.     Plaintiffs bring this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and

laws of the United States). On March 29, 2021, Plaintiffs issued a 60-day Notice of Violation and Intent To Sue letter (the "Notice Letter"), attached hereto as **Exhibit A** and incorporated by reference herein, to PreZero US, Inc. ("PreZero"), PreZero US Services, LLC fka Recycling Allies, LLC ("PreZero LLC"), 170 North Turner, LLC ("170"), Apollo Southwest, Inc. ("Apollo"), and Armen Derderian ("Derderian" and, with PreZero, PreZero LLC, 170, and Apollo, each a "Defendant" and collectively, "Defendants"), as the owner(s) and operator(s) of the Facility (the "Owners" and/or "Operators"). The Notice Letter informed Defendants of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as amended by Order No. 20XX-XXXX*) (hereinafter and as amended, the "Storm Water Permit") and the Clean Water Act at the subject industrial facility located at 170 N Turner Ave, Ontario, California 91761 (the "Facility"). The Notice Letter informed Defendants of Plaintiffs' intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

2.      The Notice Letter was also sent to the registered agent for each Defendant, the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board (the "State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region (the "Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.      More than sixty (60) days have passed since the Notice Letter was sent via certified mail to Defendants and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA, USDOJ, nor the State of California have commenced or are diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is

not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

5.     Plaintiffs seek relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II.     **INTRODUCTION**

6.     This complaint seeks relief for Defendants' unlawful discharges of pollutants into waters of the United States from their industrial operations at the Facility. Specifically, this complaint seeks relief for Defendants' discharges of pollutants from the Facility, which enter into the Deer Creek Channel, which flows through the Chris Basin to Cucamonga Creek, which then flows into Mill Creek, discharging into Prado Wetlands, discharging into the Santa Ana River, and eventually the Pacific Ocean (collectively referred to as the "Receiving Waters"), in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations have been occurring since at least January 28, 2016 and are ongoing and continuous.

7.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering marine and river surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once abundant and varied fisheries, these waters are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals,

such as aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

## III.    **PARTIES**

### A. Inland Empire Waterkeeper and Orange County Coastkeeper.

8.    Inland Empire Waterkeeper is a program of Orange County Coastkeeper. Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506.

9.    Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

10.    Together Inland Empire Waterkeeper and Orange County Coastkeeper (together, "Waterkeepers") have approximately over 1,300 members who live and/or recreate in and around the Santa Ana River watershed. Waterkeepers are dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of local surface waters. To further these goals, Waterkeepers actively seek federal and state agency implementation of the Clean Water Act and, where necessary, directly initiate enforcement actions on behalf of themselves, their members, and others.

11.    Waterkeepers' members use and enjoy the waters that the Facility discharges into, including Deer Creek, Cucamonga Creek, Mill Creek, Prado Wetlands, the Santa Ana River and its tributaries, and the Pacific Ocean for fishing, boating, swimming, bird watching, wading, picnicking, viewing wildlife, sailing, kayaking, hiking, engaging in

scientific study, including monitoring and research activities, and/or for aesthetic enjoyment. The discharge of pollutants from the Facility impairs each of these uses.

12. Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act including, but not limited to, discharges of polluted storm water from the Facility, failure to report such pollution, and failure to act in accordance with the Storm Water Permit to improve the quality of storm water discharges from the Facility, degrades water quality and harms aquatic life in the Santa Ana River and its tributaries, and impairs Waterkeepers' members' use and enjoyment of those waters, giving Plaintiffs standing on behalf of their members.

13. The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought herein will redress the harms to Plaintiffs' members caused by Defendants' activities.

14. Continuing commission of the acts and omissions alleged herein will irreparably harm Waterkeepers' members, for which harm they have no plain, speedy, or adequate remedy at law.

**B. The Owners and/or Operators of the Facility.**

15. Plaintiffs are informed and believe, and thereon allege, that PreZero LLC is an owner and/or operator of the Facility, and has been an owner and/or operator of the Facility since at least 2019, and is a responsible party under the Clean Water Act.

16. Plaintiffs are informed and believe, and thereon allege, that PreZero LLC is an active Delaware limited liability company registered to do business in California.

17. Plaintiffs are informed and believe, and thereon allege, that Hernan De La Vega, located at 4388 Serrano Drive, Jurupa Valley, CA 91752, is the registered agent for service of process for PreZero LLC.

18. Plaintiffs are informed and believe, and thereon allege, that PreZero is a

manger/member of PreZero LLC. Plaintiffs are informed and believe, and thereon allege, that PreZero is an owner and/or operator of the Facility, and has been an owner and/or operator of the Facility since at least 2019, and is a responsible party under the Clean Water Act.

19.     Plaintiffs are informed and believe, and thereon allege, that PreZero is an active Delaware corporation registered to do business in California.

20.     Plaintiffs are informed and believe, and thereon allege, that Hernan De La Vega, located at 4388 Serrano Drive, Jurupa Valley, CA 91752, is the registered agent for service of process for PreZero.

21.     Plaintiffs are informed and believe, and thereon allege, that 170 is an owner of the real estate upon which the facility operates, and has been an owner and/or operator of the Facility since at least 2009, and is a responsible party under the Clean Water Act.

22.     Plaintiffs are informed and believe, and thereon allege, that 170 is an active California limited liability company.

23.     Plaintiffs are informed and believe, and thereon allege, that Armen Derderian, located at 3981 Stonebridge Ct., Rancho Santa Fe, CA 92091-4590, is the registered agent for service of process for 170.

24.     Plaintiffs are informed and believe, and thereon allege, that Derderian is the Facility Operator identified in the Facility's Notice of Intent for coverage under the Storm Water Permit. Plaintiffs are informed and believe, and thereon allege, that Derderian is an owner and/or operator of the Facility, and has been an owner and/or operator of the Facility since at least 2015, and is a responsible party under the Clean Water Act.

## IV.   **LEGAL BACKGROUND**

### A.   **The Clean Water Act.**

25.      Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a)

prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

26.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

27.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

28.    The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

29.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

30.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id.*

31.    The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

32.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

33.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

34.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

35.     Defendants are each a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

36.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

37.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $56,460 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after December 23, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

38.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**A.     California's Storm Water Permit.**

39.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

40.     Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or

through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

41.     California is a state authorized by EPA to issue NPDES permits.

42.     In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

43.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

44.     The Storm Water Permit was issued on July 1, 2015 pursuant to Order No. 2014-0057-DWQ.

45.     On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State Board amended the Storm Water Permit to incorporate Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

46.     In order to discharge storm water to waters of the United States lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. *See* 33. U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); *see also* Storm Water Permit Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit, Finding 17.

47.     The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* Storm Water Permit, Discharge Prohibition III(B).

48.     Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section XXI(A) (Duty to Comply).

**B.     The Storm Water Permit's Effluent Limitations.**

49.     The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Storm Water Permit, Section V(A). Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. *See* Storm Water Permit, Section V(A).

50.     Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Storm Water Permit, Effluent Limitation V(A).

51.     The Storm Water Permit requires operators to implement certain minimum BMPs, as well as advanced BMPs as necessary, to achieve compliance with technology-based effluent limits. Advanced BMPs include: (1) exposure minimization BMPs, (2) storm water containment and discharge reduction BMPs, (3) treatment control BMPs, and (4) additional advanced BMPs needed to meet the effluent limitations of the Storm Water Permit. *See* Storm Water Permit, Section X(H).

52.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks").

53.     The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. Storm Water Permit, Effluent Limitation V(A); *See* EPA's NPDES MSGP Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000). *See also Santa Monica Baykeeper v. Kramer Metals, Inc.,* 619 F.Supp.2d 914, 924 (C.D. Cal. 2009)

(holding that "EPA Benchmarks are relevant guidelines that should be used to evaluate the efficacy of a facility's BMPs"). The EPA Benchmarks are, in part, incorporated into the Storm Water Permit via the Table 2 Numeric Action Levels ("NALs"). *See* Storm Water Permit, Monitoring, Sampling and Analysis, XI(B), *and* Section I(M), Finding 62.

54.     The NALs for the following parameters are as follows: pH – 6.0 – 9.0 standard units ("s.u."); Total Suspended Solids ("TSS") – 100 mg/L; Biological Oxygen Demand ("BOD") – 30 mg/L; Chemical Oxygen Demand ("COD") – 120 mg/L; Iron – 1.0 mg/L; Nitrate plus Nitrate as nitrogen ("N+N") – 0.68 mg/L; Oil and Grease ("O&G") – 15 mg/L; and Aluminum – 0.75 mg/L.

55.     Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the facility.

**C.     The Storm Water Permit's Receiving Water Limitations.**

56.     The CWA and the Storm Water Permit's Receiving Water Limitations prohibit storm water discharges and authorized non-storm water discharges that (A) cause or contribute to an exceedance of applicable Water Quality Standards ("WQS"), (B) adversely affect human health and/or the environment, or (C) contain pollutants in quantities that threaten to cause pollution or a public nuisance. 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§122.4(d), 122.4(i), 122.44(d); Storm Water Permit, Receiving Water Limitation VI(A)-(C); Storm Water Permit, Discharge Prohibition III(C).

57.     WQS establish the water quality goals for a water body. 40 C.F.R. §131.2.

58.     WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

59.     Discharges that contain pollutants in excess of an applicable WQS cause and/or contribute to impairment of the beneficial uses of the waters that receive polluted discharges and violate the Storm Water Permit and the Clean Water Act. *See* Storm Water

Permit, Receiving Water Limitation VI(A).

60.    The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan, called a basin plan, which contains WQS for water bodies within its geographical area.

61.    The California Regional Water Quality Control Board, Santa Ana Region (the "Santa Ana Regional Board" or "Regional Board") issued the Basin Plan for the Santa Ana Region (the "Santa Ana Basin Plan" or "Basin Plan"). The Santa Ana Basin Plan identifies the "Beneficial Uses" of water bodies in the region.

62.    Plaintiffs are informed and believe, and thereon allege, that polluted storm water from the Facility discharges into the Deer Creek Channel, which flows through the Chris Basin to Cucamonga Creek, which flows into Mill Creek, discharging into Prado Wetlands, which discharges into the Santa Ana River and eventually the Pacific Ocean.

63.    Plaintiffs are informed and believe, and thereon allege, that each of the receiving waters described in paragraph 62 are waters of the United States.

64.    The existing and intermittent beneficial uses for the valley reach of Deer Creek include: Municipal and Domestic Water Supply (MUN); Groundwater Recharge (GWR); Water Contact Recreation (REC 1); Non-contact Water Recreation (REC 2); Warm Freshwater Habitat (WARM); and Wildlife Habitat (WILD). Table 3-1. Deer Creek connects with Cucamonga Creek, Reach 1 for which existing and intermittent beneficial uses include: Groundwater Recharge (GWR); Non-contact Water Recreation (REC 2); Limited Warm Freshwater Habitat (LWARM); and Wildlife Habitat (WILD). *Id.* Cucamonga Creek connects with Mill Creek (Prado Area), for which existing and intermittent beneficial uses include: Water Contact Recreation (REC 1); Non-contact Water Recreation (REC 2); Warm Freshwater Habitat (WARM); Wildlife Habitat (WILD); and Rare, Threatened or Endangered Species (RARE). *Id.* Mill Creek connects with Prado Wetlands, for which existing and intermittent beneficial uses include: Water Contact Recreation (REC 1); Non-contact Water Recreation (REC 2); Warm Freshwater

Habitat (WARM); Wildlife Habitat (WILD); and Rare, Threatened or Endangered Species (RARE). Prado Wetlands flow into Reach 2 of the Santa Ana River, which flows into Reach 1 of the Santa Ana River and discharges to the Pacific Ocean. The collective Beneficial Uses of Reaches 1 and 2 of the Santa Ana River include: Agricultural Supply (AGR); Groundwater Recharge (GWR); Water Contact Recreation (REC 1); Non-contact Water Recreation (REC 2); Warm Freshwater Habitat (WARM); Wildlife Habitat (WILD); Rare, Threatened or Endangered Species (RARE); and Fish Spawning (SPWN). *Id.*

65.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

66.     According to the 2016 303(d) List of Impaired Water Bodies, Reach 1 of Cucamonga Creek is impaired for pollutants such as copper, lead, and zinc; Mill Creek (Prado Area) is impaired for indicator bacteria, TSS, and nutrients; and the Prado Wetlands are impaired for pH.[1]

67.     Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic-dependent wildlife that depend on these waters.

68.     The Receiving Waters are ecologically sensitive areas, which provide an essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species, including rare and/or threatened aquatic species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special biological significance of the Receiving Waters. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes people to toxic metals and other contaminants in storm water and non-storm water

---

[1] 2016 Integrated Report, *available at* https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2014_2016.shtml (last access on March 29, 2021).

discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

69.    Polluted discharges from industrial facilities, such as the Facility, can contain pH-affecting substances; metals, such as iron, magnesium, and aluminum; toxic metals, such as lead, zinc, nickel, cadmium, chromium, copper, arsenic, and mercury; COD; BOD; TSS; total organic carbon ("TOC"); benzene; gasoline and diesel fuels; cyanide; ammonia-N; fuel additives; paint; coolants; antifreeze; N+N; trash; indicator bacteria; and O&G. Discharges of polluted storm water to the Santa Ana River and the Pacific Ocean pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

70.    Discharges of pollutants at levels above WQS, like those from the Facility, cause or contribute to the impairment of the Beneficial Uses of the Receiving Waters.

71.    WQS may be either numeric or narrative objectives. Applicable WQS include, among others, the water quality objectives in the Basin Plan, and the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR").

72.    The Santa Ana Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Santa Ana Basin Plan, 4-18.

73.    The Santa Ana Basin Plan also includes a narrative WQS that establishes a toxicity standard which states that "[t]he concentrations of toxic substances in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Santa Ana Basin Plan, 4-20.

74.    Further, the Santa Ana Basin Plan states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." *See* Santa Ana Basin Plan 4-20.

75.    The CTR includes numeric criteria set to protect human health and the environment in the State of California. Water Quality Standards; Establishment of

Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

76.    The WQS for zinc in the CTR is 0.12 mg/L and for copper is 0.013 mg/L, assuming a water hardness calculation of 100 mg/L. The CTR numeric limits are expressed as dissolved metal concentrations.

77.    Discharges with pollutant levels that cause or contribute to an exceedance of the CTR criteria, the Basin Plan standards, and/or other applicable WQS in the Receiving Waters are violations of Receiving Water Limitation Section VI(A) of the Storm Water Permit.

78.    The Storm Water Permit's Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* Storm Water Permit, Section VI(B).

79.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI(B) of the Storm Water Permit.

**D.    The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

80.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") prior to conducting, and in order to continue, industrial activities. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must meet all of the requirements of the Storm Water Permit. Storm Water Permit, Sections X(A)-(H); See also Storm Water Permit, Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G).

81.    The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-

storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

82.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X(A)-(H).

83.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

84.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to

determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and XV.

85.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1).

E.     **The Storm Water Permit's Monitoring Implementation Program Requirements.**

86.     The Storm Water Permit requires permittees to develop and implement storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. Storm Water Permit, Sections X(I) and XI.

87.     The Storm Water Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the Storm Water Permit. Storm Water Permit Sections X(I) and XI(A)-XI(D).

88.     The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* Storm Water Permit, Section XI.

89.     An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id.*

90.     The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the Storm Water Permit. Storm Water Permit, Section XI(B).

91.     Section XI(A)(1) of the Storm Water Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor

industrial equipment and activities, BMPs, and all potential sources of pollution.

92.     Section XI(A)(2) of the Storm Water Permit requires dischargers to conduct storm water visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

93.     Dischargers are required to document and maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3).

94.     The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. Storm Water Permit, Section X(B)(1).

95.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Section XI(B)(4).

96.     Section XI(B)(1) of the Storm Water Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("QSE").

97.     The Storm Water Permit requires dischargers to collect and analyze storm water samples from at least two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30), which must be analyzed for TSS, pH, O&G and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment—in addition to those required under the Standard Industrial Classification ("SIC") code. Storm Water Permit, X(B)(3) and X(G)(2).

98.     Table 1 of the Storm Water Permit requires dischargers with SIC code 5093, such as the Facility, to analyze samples for iron, lead, aluminum, zinc, and COD.

99.     Section XI(B)(6)(c) of the Storm Water Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

100.    Section XI(B)(6)(f) of the Storm Water Permit requires dischargers to analyze additional parameters required by the Regional Board.

101.    Section XI(B)(6) of the Storm Water Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved TMDLs.

102.    Section XI(B)(11) of the Storm Water Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

**F.      The Storm Water Permit's Exceedance Response Actions Requirements.**

103.    Under the Storm Water Permit, facility operators are required to perform Exceedance Response Actions ("ERAs") as appropriate whenever sampling indicates NAL exceedances.

104.    An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

105.    An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. Storm Water Permit, Section XII(A).

106.    Upon receiving NOI coverage, all permittees are deemed in "Baseline status." See Storm Water Permit, Section XII(B).

107.    A permittee's Baseline status for any given parameter changes to "Level 1

status" if sampling results indicate an NAL exceedance for that same parameter. *See* Storm Water Permit, Section XII(C).

108.   Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of Storm Water Permit. *See* Storm Water Permit, Section XII(C)(1)(a)-(c).

109.   Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* Storm Water Permit, Section XII(C)(1)(c).

110.   Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes the a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

111.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* Storm Water Permit, Section XII(C)(2)(a)(iii).

112.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent

to BMP implementation indicate no additional NAL exceedances for that parameter. *See* Storm Water Permit, Section XII(C)(2)(b).

113.   A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* Storm Water Permit, Section XII(D).

114.   A discharger in Level 2 status shall submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. *See*, Storm Water Permit, Section XII(D).

**G.     The Storm Water Permit's Reporting Requirements.**

115.   Section XVI of the Storm Water Permit requires permittees to submit via SMARTS an Annual Report by July 15 of each year.

116.   The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the requirements of the Storm Water Permit, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *See* Storm Water Permit, Section XVI.

117.   Annual Reports are certified by the legally responsible person under penalty of perjury.

**V.     FACTUAL BACKGROUND**

   **A.     The Facility's Storm Water Permit Coverage.**

118.   In order for the Facility to lawfully discharge pollutants to waters of the United States, the Facility Owners and/or Operators were required to obtain an NPDES

Permit and comply with its terms.

119.   Plaintiffs are informed and believe, and thereon allege, that on or about August 6, 2015, Defendants obtained Storm Water Permit coverage for the Facility by submitting an NOI to the State Board (the "2015 NOI").

120.   Plaintiffs are informed and believed, and thereon allege, that on or about January 9, 2020, Defendants submitted a subsequent NOI to the State Board (the "2020 NOI" and, together with the 2015 NOI, the "NOI").

121.   Plaintiffs are informed and believe, and thereon allege, the 2015 NOI and the 2020 NOI each identified the operator of the Facility as Armen Derderian located at 4686 Mercury Street, San Diego, California 92111.

122.   Plaintiffs are informed and believe, and thereon allege, the 2015 NOI and the 2020 NOI each identified the site name of the Facility as "Armen Derderian."

123.   The 2015 NOI and the 2020 NOI each list the Facility as 2.85 acres in size, with 2.15 acres of industrial area exposed to storm water.

124.   Neither the 2015 NOI nor the 2020 NOI list what percent of the site is impervious.

125.   The State Board's electronic SMARTS database, lists the current Facility Waste Discharge Identification ("WDID") number as 8 36I022607.

126.   SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

127.   The 2015 NOI and the 2020 NOI each list the SIC code for the Facility as 5093 (Scrap and Waste Materials).

128.   SIC code 5093 facilities must obtain Storm Water Permit coverage for the entire facility. *See* Storm Water Permit, Attachment A, ¶ 2.

129.   Plaintiffs are informed and believe, and thereon allege, that additional SIC codes, including 4231 (Terminal and Joint Terminal Maintenance, Facilities), 2875 (Fertilizers, Mixing Only), and/or 4953 (Refuse Systems), may also apply to the Facility.

130.   Plaintiffs are informed and believe, and thereon allege, the 2015 NOI lists the Receiving Water as Cucamonga Creek via indirect flow.

131.   Plaintiffs are informed and believe, and thereon allege, the 2020 NOI lists the Receiving Water as Lower Deer Creek Channel via direct water flow.

**B.    Industrial Activities and Pollutant Sources at the Facility.**

132.   Plaintiffs are informed and believe, and thereon allege, that the Facility is a waste transfer/processing and recycling services facility.

133.   Plaintiffs are informed and believe, and thereon allege, that at the Facility, Defendants accept, unload, sort, process, load, and ship recycled materials, including organic materials.

134.   Plaintiffs are informed and believe, and thereon allege, that electrical and mechanical equipment and vehicle repairs also occur at the Facility.

135.   Plaintiffs are informed and believe, and thereon allege, that the industrial activities and areas of industrial activity are sources of pollutants at the Facility.

136.   Plaintiffs are informed and believe, and thereon allege, that waste materials are stored and processed outside without adequate cover or containment, resulting in discharges of polluted storm water and unauthorized non-storm water.

137.   Plaintiffs are informed and believe, and thereon allege, that hazardous materials, trucks, and equipment associated with maintenance are located outside without adequate cover or containment.

138.   The Facility's SWPPP section entitled "Description of Potential Pollutant Sources," identifies potential pollutants sources associated with the industrial activities at the Facility. Plaintiffs are informed and believe, and thereon allege, that pollutants associated with operations at the Facility include, but are not limited to: metals (such as zinc, copper, lead, aluminum, and iron); COD; fuels; nitrates; nitrites; trash; indicator bacteria; nutrients; TSS; O&G; and pH-affecting substances.

139.   According to the Facility's SWPPP, storm water generally flows from the eastern portion of the Facility towards the western portion, discharging at a single

discharge point along the western border referred to as "DP-1." Storm water discharges from DP-1 directly into the Deer Creek Channel, which flows to Cucamonga Creek, which flows to Mill Creek, which discharges to Prado Wetlands, into the Santa Ana River, and eventually the Pacific Ocean.

140.   Plaintiffs are informed and believe, and thereon allege, the Facility Owners and/or Operators have not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility, prevent unauthorized non-storm water discharges, prevent the exposure of pollutants to storm water, prevent the subsequent discharge of polluted storm water from the Facility during rain events, and address contaminated storm water and non-storm water discharges.

141.   Plaintiffs are informed and believe, and thereon allege, the Facility Owners' and/or Operators' failure to develop and/or implement required BMPs results in the exposure of pollutants associated with industrial activities to precipitation, and in the Facility's discharge of polluted storm water into the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

142.   Plaintiffs are informed and believe, and thereon allege, during rain events, storm water carries pollutants from the Facility's uncovered staging areas, contaminated ground, equipment, washing areas, maintenance areas, and other areas into Deer Creek Channel in violation of the Storm Water Permit and the Clean Water Act.

143.   Plaintiffs are informed and believe, and thereon allege, that unauthorized non-storm water discharges occur at the Facility when wash water overflows, containers leak, litter is windblown, or discharges containing high concentrations of pollutants are directly released into Deer Creek Channel.

144.   Plaintiffs are informed and believe, and thereon allege, that the resulting illegal discharges of polluted storm and non-storm water negatively impact Waterkeepers' members' use and enjoyment of the Receiving Waters by increasing the quantity of pollutants in, and degrading the quality of, the Receiving Waters and by posing risks to human health and aquatic life.

145.   Plaintiffs are informed and believe, and thereon allege, that paragraphs 131-141 are all significant pollutant sources at the Facility.

C.     **Defendants' Violations of Storm Water Permit Discharge Prohibitions**

146.   Plaintiffs are informed and believe, and thereon allege, that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

147.   Plaintiffs are informed and believe, and thereon allege, that unauthorized non-storm water discharges are ongoing and will continue until the Facility Owners and/or Operators develop and implement BMPs that prevent prohibited non-storm water discharges or obtain separate NPDES permit coverage.

148.   Plaintiffs are informed and believe, and thereon allege, unauthorized non-storm water discharges occur as a result of wastewater overflows, leaks, explosions, power washing and cleaning, trash and/or debris, or, in at least some instances, intentional releases directly into Deer Creek.

149.   Plaintiffs are informed and believe, and thereon allege, that Defendants conduct the activities described above without BMPs to prevent unauthorized non-storm water discharges.

150.   Plaintiffs are informed and believe, and thereon allege, that non-storm water discharges resulting from the activities described above are not from sources listed among the authorized non-storm water discharges in the Storm Water Permit and, thus, are always prohibited under the Storm Water Permit.

D.     **Defendants' Violations of the Storm Water Permit's Effluent Limitations.**

151.   Plaintiffs are informed and believe, and thereon allege, that BMPs that achieve BAT/BCT have not been implemented at the Facility.

152.   Plaintiffs are informed and believe, and thereon allege, that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above benchmark levels established by the EPA and

incorporated into the Storm Water Permit.

153. Plaintiffs are informed and believe, and thereon allege, storm water discharges from the Facility contain concentrations of pollutants with exceedances of EPA benchmarks and NALs for pH, TSS, BOD, COD, zinc, aluminum, iron, O&G, N+N, and copper.

154. Plaintiffs are informed and believe, and thereon allege, that the significant exceedances of NALs demonstrate that the Facility Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards in order to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water from the Facility.

155. Plaintiffs are informed and believe, and thereon allege, that the Effluent Limitations of the Storm Water Permit and Section 301(a) of the Clean Water Act are violated each day the Facility fails to implement BMPs that achieve compliance with the BAT/BCT standards.

**E.    Defendants' Violations of the Storm Water Permit's Receiving Water Limitations.**

156. The Storm Water Permit's Receiving Water Limitations prohibit storm water discharges and authorized non-storm water discharges that (A) cause or contribute to an exceedance of any applicable WQS, (B) adversely affect human health and/or the environment, or (C) contain pollutants in quantities that threaten to cause pollution or a public nuisance. Storm Water Permit, Receiving Water Limitation VI(A)-(C).

157. Plaintiffs are informed and believe, and thereon allege, that storm water sampling at the Facility demonstrates that the Facility's discharges contain concentrations of pollutants that cause or contribute to a violation of an applicable WQS in the CTR and, thus, violate the Storm Water Permit and the Clean Water Act. *See* Storm Water Permit, Receiving Water Limitation VI(A).

158. Plaintiffs are informed and believe, and thereon allege, that discharges from

the Facility contain concentrations of zinc and copper that cause or contribute to a violation of an applicable WQS in the CTR.

159.   Plaintiffs are informed and believe, and thereon allege, that storm water sampling at the Facility demonstrates that the Facility's discharges contain concentrations of pollutants that cause or contribute to a violation of an applicable WQS in the Basin Plan and, thus, violate the Storm Water Permit and the Clean Water Act. *See* Storm Water Permit, Receiving Water Limitation VI(A).

160.   Plaintiffs are informed and believe, and thereon allege, that the Facility has routinely exceeded the WQS in the Basin Plan for inland surface waters for pH.

161.   Plaintiffs are informed and believe, and thereon allege, that each time the Facility has discharged storm water with pH levels below 6.5 s.u., it caused or contributed to the impairment of the Receiving Waters, which are already impaired for pH.

162.   Plaintiffs are informed and believe, and thereon allege, that storm water sampling at the Facility demonstrates that discharges contain concentrations of pathogen indicator bacteria, such as E. Coli and Enterococcus, in violation of the Basin Plan. *See* Basin Plan, Chapter 4.

163.   Plaintiffs are informed and believe, and thereon allege, that storm water samples collected by Waterkeepers indicate the Facility has routinely exceeded E.Coli concentrations in violation of the Basin Plan's bacteria water quality objective for inland surface waters designated REC 1.

164.   Plaintiffs are informed and believe, and thereon allege, that because the Facility's storm water discharges contain concentrations of indicator bacteria in excess of the water quality objectives established in the Basin Plan, the Facility causes or contributes to the impairment of the Receiving Waters, which are already impaired for bacteria.

165.   Plaintiffs are informed and believe, and thereon allege, that Defendants have violated and continues to violate the numeric WQS in the CTR and the Basin Plan, and by extension the Clean Water Act, for zinc, copper, pH, and bacteria each time polluted storm water and unauthorized non-storm water discharges from the Facility.

166.   Plaintiffs are informed and believe, and thereon allege, that Defendants have violated and continue to violate the Storm Water Permit's Receiving Water Limitation VI(A) each time polluted storm water and unauthorized non-storm water discharges from the Facility.

167.   Plaintiffs are informed and believe, and thereon allege, that storm water sampling at the Facility demonstrates that the Facility's discharges contain concentrations of pollutants which adversely impact human health and the environment in violation of the Storm Water Permit and the Clean Water Act. *See* Storm Water Permit, Receiving Water Limitation VI(B).

168.   Plaintiffs are informed and believe, and thereon allege, that the Facility's storm water and unauthorized non-storm water discharges contain extremely high concentrations of pathogen indicator bacteria in excess of the Basin Plan water quality objective.

169.   Plaintiffs are informed and believe, and thereon allege, that because the Facility's storm water and unauthorized non-storm water discharges contain concentrations of indicator bacteria in excess of the Basin Plan water quality objectives and drain to a waterbody impaired for bacteria, the Facility's storm water discharges adversely affect human health and/or the environment.

170.   Plaintiffs are informed and believe, and thereon allege, that the Facility's storm water and unauthorized non-storm water discharges also contain extremely high concentrations of heavy metals (such as zinc, copper, aluminum, and iron); COD; BOD; TSS; N+N; indicator bacteria; O&G; and pH affecting substances.

171.   Plaintiffs are informed and believe, and thereon allege, that Defendants have violated and continue to violate the Storm Water Permit's Receiving Water Limitation VI(B) each time polluted storm water and unauthorized non-storm water discharges from the Facility.

172.   Plaintiffs are informed and believe, and thereon allege, that storm water sampling at the Facility demonstrates that the Facility's discharges contain concentrations

of pollutants which threaten to cause pollution or a public nuisance in violation of the Storm Water Permit and the Clean Water Act. *See* Storm Water Permit, Receiving Water Limitation VI(C).

173.   Plaintiffs are informed and believe, and thereon allege, that the Facility's storm water and unauthorized non-storm water discharges have a strong, indecent, and offensive odor which affects neighboring businesses.

174.   Plaintiffs are informed and believe, and thereon allege, that Defendants have violated and continue to violate the Storm Water Permit's Receiving Water Limitation VI(C) each time polluted storm water and unauthorized non-storm water discharges from the Facility.

### F.   Defendants' Violations of the Storm Water Permit's SWPPP Requirements.

175.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators have conducted and continue to conduct operations at the Facility with an inadequately developed, implemented, and/or improperly revised SWPPP, in violation of the Storm Water Permit's SWPPP requirements.

176.   The Facility's SWPPP is publicly available via the SMARTS database and was uploaded on August 14, 2015, with a subsequent SWPPP dated January 2017 and revised March 2017.

177.   Plaintiffs are informed and believe, and thereon allege, that the January 2017 SWPPP referenced in paragraph 176 is the current SWPPP for the Facility.

178.   Plaintiffs are informed and believe, and thereon allege, that a site map ("Site Map") was uploaded to SMARTS on August 5, 2015, and again in January and April of 2017, and that the Site Map is a map of the Facility submitted pursuant to Section II(B)(3)(a) of the Storm Water Permit.

179.   Plaintiffs are informed and believe, and thereon allege, that Defendants have failed to properly revise the Facility's SWPPP and Site Map in violation of the Storm Water Permit.

180.   Plaintiffs are informed and believe, and thereon allege, that the Site Map fails to identify storm water collection and conveyance systems and/or structural control measures in violation of the Storm Water Permit.

181.   Plaintiffs are informed and believe, and thereon allege, that numerous instances of unauthorized non-storm water discharges and/or spills at the Facility have resulted in off-site discharges, but the SWPPP fails to identify significant spills or leaks in violation of the Storm Water Permit.

182.   Plaintiffs are informed and believe, and thereon allege, that the Site Map in the SWPPP fails to depict areas where spills or leaks have occurred in violation of the Storm Water Permit.

183.   Plaintiffs are informed and believe, and thereon allege, that the SWPPP's pollutant source assessment and the Monitoring Implementation Plan fail to include all pollutants likely to be present at the Facility, as determined by Waterkeepers' sampling results.

184.   Plaintiffs are informed and believe, and thereon allege, that the pollutant source assessment and Monitoring Implementation Plan fail to account for the entirety of the pollutants present at the Facility.

185.   Plaintiffs are informed and believe, and thereon allege, that although the SWPPP lists pathogens, coliform bacteria, copper, and nutrients as pollutants for which the Receiving Waters are impaired, the SWPPP erroneously concludes that these parameters are not present at the Facility.

**G.    Defendants' Violations of the Storm Water Permit's Monitoring Implementation Plan Requirements.**

186.   Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to adequately develop, implement, and/or revise an MIP, in violation of MIP requirements of the Storm Water Permit.

187.   Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to collect storm water discharge samples as required pursuant

to Section XI(B)(3) of the Storm Water Permit.

188.   Plaintiffs are informed and believe, and thereon allege, that the Facility reported samples from just two QSEs for 2015-2016.

189.   Plaintiffs are informed and believe, and thereon allege, that the Facility reported samples from just one QSE for 2016-2017.

190.   Plaintiffs are informed and believe, and thereon allege, that the Facility did not report a single sample for 2017-2018.

191.   Plaintiffs are informed and believe, and thereon allege, that the Facility reported samples from just one QSE for 2018-2019.

192.   Plaintiffs are informed and believe, and thereon allege, that the Facility did not report a single sample for 2019-2020.

193.   Plaintiffs are informed and believe, and thereon allege, that in the instances in which the Facility did sample, it failed to sample for all required parameters as discussed in Section V (F) herein.

194.   Plaintiffs are informed and believe, and thereon allege, that additional SIC codes apply to the Facility, and, as a result, Defendants are not sampling for all pollutants required pursuant to Storm Water Permit, Section XI(B)(6)(d).

195.   Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to conduct and record monthly dry weather visual observations in violation of Section XI(A) of the Storm Water Permit.

196.   Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to conduct and/or document discharge visual observations from each discharge location as required by Section XI(A) of the Storm Water Permit.

### H.   Defendants' Violations of the Storm Water Permit's Exceedance Response Requirements.

197.   Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to take Exceedance Response Actions as required by Section XII of the Storm Water Permit.

198.   Plaintiffs are informed and believe, and thereon allege, that based on sample results submitted by Defendants, the Facility triggered Level 1 status during the 2015-2016 reporting year for pH.

199.   Pursuant to the Storm Water Permit, Defendants were required to (i) complete a Level 1 ERA Evaluation, (ii) prepare a Level 1 ERA Report, and (iii) amend the SWPPP accordingly, and (iv) submit such documents to SMARTS. Plaintiffs are informed and believe, and thereon allege, that the Defendants failed to submit ERA documentation.

200.   Plaintiffs are informed and believe, and thereon allege, that the Facility Owners and/or Operators have failed to adequately address the Facility's pH issues.

## I.     Defendants' Failure To Comply With The Storm Water Permit's Reporting Requirements.

201.   Plaintiffs are informed and believe, and thereon allege, that Defendants have failed and continue to fail to submit Annual Reports that comply with the Storm Water Permit's reporting requirements.

202.   Plaintiffs are informed and believe, and thereon allege, that the 2015-2016 Annual Report submitted by the Defendants falsely certifies that all required QSEs were sampled when the Facility only reported results from two sampling events.

203.   Plaintiffs are informed and believe, and thereon allege, that the 2016-2017 Annual Report certifies: "[s]amples were not collected at least twice (2) within each half of the reporting year due to insufficient discharge and storm events that occurred outside of facility operating hours."

204.   Plaintiffs are informed and believe, and thereon allege, that the 2018-2019 Annual Report certifies: "Our facility did not collect the required number of samples during the first half of the reporting year due to insufficient discharge, rain events occurring outside of operating hours and not having 48 hours of dry weather in between rain events. In the second half of the year, our facility was only able to collect one sample due to insufficient discharge and rain events occurring outside of operating hours."

205.   Plaintiffs are informed and believe, and thereon allege, that the 2019-2020 Annual Report certifies: "Our facility did not sample the required number of Qualifying Storm Events during the reporting year for all discharge locations because there was insufficient discharge to perform sampling and rain events occurred outside of operating hours. In addition, our facility was operating under reduced hours in March, April, and May due to complications arising from COVID-19."

206.   Plaintiffs are informed and believe, and thereon allege, that the Defendants' statements regarding rain events in paragraphs 203-205 are contradicted by rain data for those reporting years.

207.   Plaintiffs are informed and believe, and thereon allege, that with regard to the COVD-19 statement in paragraph 205, State Water Board policy explicitly confirmed permit compliance was an essential function and if there was a specific requirement that could not be timely met because it would be inconsistent with directives or guidelines related to COVID-19, the Facility was required to notify the applicable Water Board, which it did not do.

208.   Plaintiffs are informed and believe, and thereon allege, that with regard to the COVID-19 statement in paragraph 205, a modification of operating hours would have triggered a SWPPP update, which the Facility did not do.

209.   Plaintiffs are informed and believe, and thereon allege, that Defendants certified instances of noncompliance in their Annual Reports without proper justification.

210.   Plaintiffs are informed and believe, and thereon allege, that in the 2015-2016 Annual Report, Defendants certified that they failed to conduct the required Annual Evaluation because Defendants were "[s]till working on it."

211.   Plaintiffs are informed and believe, and thereon allege, that in the 2018-2019 Annual Report, Defendants certified it failed to conduct required monthly visual observations because of "a staff change," whereby "new staff was unaware of the permit's requirements."

212.   Plaintiffs are informed and believe, and thereon allege, that Defendants'

Annual Reports erroneously certify that pathogens, coliform bacteria, copper, and nutrients are not present at the Facility.

213.   Plaintiffs are informed and believe, and thereon allege, that Defendants erroneously certified they had included the Identified Pollutants within the Facility's SWPPP pollutant source assessment.

214.   Based on the assertions made in paragraphs 202, 210, 212, and 213 above, and on other information available to Plaintiffs, Plaintiffs are informed and believe, and thereon allege, that Defendants submitted an incomplete and/or incorrect 2015-2016 Annual Report that failed to comply with the Storm Water Permit. As a result, Defendants are in daily violation of the Storm Water Permit.

215.   Based on the assertions made in paragraph 203, 212, and 213 above, and on other information available to Plaintiffs, Plaintiffs are informed and believe, and thereon allege, that Defendants submitted an incomplete and/or incorrect 2016-2017 Annual Report that failed to comply with the Storm Water Permit. As a result, Defendants are in daily violation of the Storm Water Permit.

216.   Based on the assertions made in paragraph 204, 211, 212, and 213 above, and on other information available to Plaintiffs, Plaintiffs are informed and believe, and thereon allege, that Defendants submitted an incomplete and/or incorrect 2018-2019 Annual Report that failed to comply with the Storm Water Permit. As a result, Defendants are in daily violation of the Storm Water Permit.

217.   Based on the assertions made in paragraph 205, 207, 208, 212, and 213 above, and on other information available to Plaintiffs, Plaintiffs are informed and believe, and thereon allege, that Defendants submitted an incomplete and/or incorrect 2019-2020 Annual Report that failed to comply with the Storm Water Permit. As a result, Defendants are in daily violation of the Storm Water Permit.

# VI.    CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Unauthorized Non-Storm Water Discharges from the Facility in Violation of Storm Water Permit Discharge Prohibitions**

**33 U.S.C. §§ 1311(a)**

218.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

219.   Plaintiffs are informed and believe, and thereon allege, that Defendants discharged unauthorized non-storm water from the Facility.

220.   Defendants' discharge of unauthorized non-storm water is a daily violation of the Storm Water Permit and the CWA. Storm Water Permit, Section I(C), Discharge Prohibition III(B); 33 U.S.C. § 1311(b).

221.   Defendants violated, violate and will continue to violate the Storm Water Permit Discharge Prohibitions each time non-storm water is discharged from the Facility.

222.   Plaintiffs are informed and believe, and thereon allege, that Defendants violated the Discharge Prohibitions of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

223.   Plaintiffs are informed and believe, and thereon allege, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

224.   Plaintiffs allege that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

225.   Each and every violation of the Storm Water Permit Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

226.   By committing the acts and omissions alleged above, Defendants are subject

to an assessment of civil penalties for each and every violation of the CWA occurring from January 28, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

227.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

228.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

229.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

230.   Plaintiffs are informed and believe, and thereon allege, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

231.   Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the Storm Water Permit and the CWA. Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

232.   Defendants violated, violate and will continue to violate the Storm Water Permit Effluent Limitations each day that the Facility is not implementing BMPs that achieve BAT/BCT standards for discharges of pollutants to waters of the United States

1 | from the Facility.

2 |     233.  Plaintiffs are informed and believe, and thereon allege, that Defendants

3 | violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act

4 | within the applicable statute of limitations, and such violations are ongoing and

5 | continuous.

6 |     234.  Plaintiffs are informed and believe, and thereon allege, that Defendants' acts

7 | and omissions described herein constitute violations of individual terms of the Storm

8 | Water Permit, compliance with which is required to lawfully discharge pollutants to

9 | waters of the United States.

10 |     235.  Plaintiffs allege that its members have been harmed by Defendants' acts and

11 | omissions described herein and have standing to bring this suit.

12 |     236.  Defendants' failure to develop and/or implement BMPs that achieve the

13 | pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation

14 | of the Storm Water Permit and the CWA. Storm Water Permit, Section I(D) (Finding 32),

15 | Effluent Limitation V(A); 33 U.S.C. § 1311(b).

16 |     237.  Each and every violation of the Storm Water Permit Effluent Limitations is

17 | a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

18 |     238.  By committing the acts and omissions alleged above, Defendants are subject

19 | to an assessment of civil penalties for each and every violation of the CWA occurring

20 | from January 28, 2016 to the present, pursuant to Sections 309(d) and 505 of the CWA,

21 | 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

22 |     239.  An action for injunctive relief is authorized by CWA Section 505(a),

23 | 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

24 | would irreparably harm Plaintiffs and the citizens of the State of California, for which

25 | harm Plaintiffs have no plain, speedy, or adequate remedy at law.

26 |     240.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

27 | an actual controversy exists as to the rights and other legal relations of the Parties.

28 |     WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth

---

hereafter.

## **THIRD CAUSE OF ACTION**

**Defendants' Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1311(b), 1342, 1365(a) and 1365(f)**

241.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

242.   Plaintiffs are informed and believe, and thereon allege, that within the applicable statute of limitations, discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

243.   Plaintiffs are informed and believe, and thereon allege, that within the applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge each time storm water discharges from the Facility.

244.   Plaintiffs are informed and believe, and thereon allege, that within the applicable statute of limitations, discharges of storm water containing levels of pollutants that threaten to cause pollution or a public nuisance each time storm water discharges from the Facility.

245.   Plaintiffs are informed and believe, and thereon allege, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

246.   Plaintiffs allege that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

247.   Defendants violated, violate and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water discharges from the

Facility containing levels of pollutants that adversely impact human health and/or the environment, that cause or contribute to exceedances of WQS, and/or that causes pollution or a public nuisance.

248.   Plaintiffs are informed and believe, and thereon allege, that Defendants violated and violate the Receiving Water Limitations of the Storm Water Permit and the CWA within the applicable statute of limitations, and that such violations are ongoing and continuous.

249.   Each and every violation, within the applicable statute of limitations, of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

250.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 28, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

251.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

252.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

253.   Plaintiffs incorporate the allegations contained in the above paragraphs as

1  though fully set forth herein.

2  254.   Plaintiffs are informed and believe, and thereon allege, that within the

3  applicable statute of limitations, Defendants have failed and continue to fail to develop an

4  adequate SWPPP for the Facility, in violation of the Storm Water Permit.

5  255.   Plaintiffs are informed and believe, and thereon allege, that within the

6  applicable statute of limitations, Defendants have failed and continue to fail to adequately

7  implement the SWPPP for the Facility, in violation of the Storm Water Permit.

8  256.   Plaintiffs are informed and believe, and thereon allege, that within the

9  applicable statute of limitations, Defendants have failed and continue to fail to adequately

10  revise the SWPPP for the Facility, in violation of the Storm Water Permit.

11  257.   Defendants have been in violation of the Storm Water Permit at the Facility

12  every day from January 28, 2016, to the present.

13  258.   Defendants' violations of the Storm Water Permit and the CWA at the

14  Facility are ongoing and continuous.

15  259.   Defendants will continue to be in violation of the Storm Water Permit and

16  the CWA each and every day Defendants fail to adequately develop, implement, and/or

17  revise the SWPPPs for the Facility.

18  260.   Plaintiffs are informed and believe, and thereon allege, that Defendants' acts

19  and omissions described herein constitute violations of individual terms of the Storm

20  Water Permit, compliance with which is required to lawfully discharge pollutants to

21  waters of the United States.

22  261.   Plaintiffs allege that its members have been harmed by Defendants' acts and

23  omissions described herein and have standing to bring this suit.

24  262.   Defendants' failure to develop, implement, and/or revise their Facility

25  SWPPP is a daily violation of the Storm Water Permit and the CWA.

26  263.   Each and every violation of the Storm Water Permit SWPPP requirements at

27  the Facility is a separate and distinct violation of the CWA.

28  264.   By committing the acts and omissions alleged above, Defendants are subject

to an assessment of civil penalties for each and every violation of the CWA occurring from January 28, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

265.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

266.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against the Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Program in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

267.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

268.   Plaintiffs are informed and believe, and thereon allege, that within the applicable statute of limitations, Defendants have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

269.   Plaintiffs are informed and believe, and thereon allege, that within the applicable statute of limitations, Defendants have failed and continue to fail to adequately implement the MIP for the Facility, in violation of the Storm Water Permit.

270.   Plaintiffs are informed and believe, and thereon allege, that within the applicable statute of limitations, Defendants have failed and continue to fail to adequately revise the MIP for the Facility, in violation of the Storm Water Permit.

271.   Defendants have been in violation of the Storm Water Permit monitoring

1    requirements at the Facility every day from January 28, 2016 to the present.

2         272.   Defendants' violations of the Storm Water Permit monitoring requirements

3    and the CWA at the Facility are ongoing and continuous.

4         273.   Defendants will continue to be in violation of the Storm Water Permit and

5    the CWA each and every day they fail to adequately develop, implement, and/or revise

6    the MIP for the Facility.

7         274.   Plaintiffs are informed and believe, and thereon allege, that Defendants' acts

8    and omissions described herein constitute violations of individual terms of the Storm

9    Water Permit, compliance with which is required to lawfully discharge pollutants to

10   waters of the United States.

11        275.   Plaintiffs allege that its members have been harmed by Defendants' acts and

12   omissions described herein and have standing to bring this suit.

13        276.   Defendants' failure to develop, implement, and/or revise the MIP for the

14   Facility is a daily violation of the Storm Water Permit and the CWA.

15        277.   Each and every violation of the Storm Water Permit MIP requirements at the

16   Facility is a separate and distinct violation of the CWA.

17        278.   By committing the acts and omissions alleged above, Defendants are subject

18   to an assessment of civil penalties for each and every violation of the CWA occurring

19   from January 28, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA,

20   33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

21        279.   An action for injunctive relief under the CWA is authorized by Section 505(a)

22   of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions

23   alleged above would irreparably harm Plaintiffs and the citizens of the State of California,

24   for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

25        280.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

26   an actual controversy exists as to the rights and other legal relations of the Parties.

27        WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth

28   hereafter.

**SIXTH CAUSE OF ACTION**

**Defendants' Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

281.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

282.   Plaintiffs are informed and believe, and thereon allege, that within the applicable statute of limitations, that Defendants' 2015/2016 Annual Report fails to meet the requirements of the Storm Water Permit.

283.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendants' 2016/2017 Annual Report fails to meet the requirements of the Storm Water Permit.

284.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendants' 2017/2018 Annual Report fails to meet the requirements of the Storm Water Permit.

285.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendants' 2018/2019 Annual Report fails to meet the requirements of the Storm Water Permit.

286.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendants failed to submit a Level 1 ERA Report for pH in accordance with Section XII(C) of the Storm Water Permit.

287.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendants failed to submit a Level 2 ERA Action Plan for pH in accordance with Section XII(D) of the Storm Water Permit.

288.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendants failed to submit a Level 2 ERA Technical Report for pH in accordance with Section XII(D) of the Storm Water Permit.

289.   Plaintiffs are informed and believe, and thereon allege, within the applicable

statute of limitations, that Defendants failed to collect and report samples for all parameters in accordance with the Storm Water Permit since at least October 1, 2016.

290.   Plaintiffs are informed and believe, and thereon allege, within the applicable statute of limitations, that Defendants failed to report samples to SMARTS within thirty (30) days of receipt in accordance with Section XI(B) of the Storm Water Permit since at least October 1, 2016.

291.   Defendants have been in violation of Section XI of the Storm Water Permit and the CWA every day since at least January 28, 2016.

292.   Defendants have been in violation of Section XII of the Storm Water Permit and the CWA every day since at least October 1, 2016.

293.   Defendants have been in violation of Section XVI of the Storm Water Permit and the CWA every day since at least July 15, 2016.

294.   Plaintiffs are informed and believe, and thereon allege, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

295.   Plaintiffs allege that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

296.   Each of Defendants' failures to comply with the Storm Water Permit reporting requirements are separate, distinct, and daily violations of the Storm Water Permit and the CWA.

297.   Defendants' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

298.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 28, 2016, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

299.   An action for injunctive relief under the CWA is authorized by Section 505(a)

of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Plaintiffs have no plain, speedy, or adequate remedy at law.

300.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray judgment against Defendants as set forth hereafter.

## VII.   **RELIEF REQUESTED**

301.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A Court order declaring the Defendants to have violated and in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for unauthorized non-storm water discharges, for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, for failure to develop and implement and adequate SWPPP, for failure to submit accurate annual reports, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit;

b.   A Court order enjoining Defendants from discharging pollutants in violation of an NPDES permit;

c.   A Court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

d.   A Court order assessing civil monetary penalties for each violation of the CWA at $56,460 per day per violation for all violations that occurred after November 2, 2015 and were assessed on or after December 23, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

| | |
|---|---|
| 1 | |

    e.  A Court order awarding Plaintiffs their reasonable costs of suit, including attorneys', witness, experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

    f.  Any other relief as this Court may deem appropriate.

Dated: June 7, 2021      Respectfully submitted,


          By /s/ Sarah J. Spinuzzi
           Sarah J. Spinuzzi
           Attorney for Plaintiffs
           Inland Empire Waterkeeper
           Orange County Coastkeeper

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28